UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RODNEY VANCE et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-2171-B |
| | § | |
| SAFETY-KLEEN SYSTEMS, INC., | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Safety-Kleen Systems, Inc. ("Safety-Kleen")'s Motion to Sever (Doc. 43). For the reasons set forth below, the Court **GRANTS** the motion and **SEVERS** this case into twenty distinct civil actions.

### I.

### BACKGROUND

*A.    Factual Background*

This case is about whether workplace exposure to Safety-Kleen chemicals caused Plaintiffs' cancers. Plaintiffs are twenty former Carrier Corporation ("Carrier") employees (or personal representatives of former Carrier employees) who worked at Carrier's air conditioning plant in Tyler, Texas. Doc. 41, Am. Pet. ¶¶ 9–30. Carrier employed Plaintiffs between 1968 and 2015, and each Plaintiff worked for a different duration during that time period. Doc. 45, App. Def.'s Mot. Exs. A–T. Plaintiffs worked in a variety of roles at Carrier's facility. A majority were assembly line workers, but others were employed as electrical technicians, drivers, equipment repairmen, coil shop workers, crew leaders, or press operators. *Id.*

Defendant Safety-Kleen provided Carrier with chemical solvents that allegedly caused Plaintiffs to develop various types of cancer. Doc. 41, Am. Pet. ¶ 31. Plaintiffs allege that, during the relevant time period, Carrier used Safety-Kleen solvents[1] that contained trichloroethylene ("TCE") and benzene. *Id.* Safety-Kleen disputes this allegation, maintaining that the solvents at issue contained neither TCE nor benzene. Doc. 44, Def.'s Br. 2. Carrier used these solvents to degrease fabricated parts. Doc. 41, Am. Pet. ¶ 32. This degreasing process "involves heating solvents like TCE in a degreasing unit to a hot vapor [that] condenses onto parts placed in the unit and carries contaminants away . . . as it beads and then drips off." *Id.* Plaintiffs allege that during this process "105 Solvent would flow in a stream through the air in an open system . . . causing the carcinogens in the solvent to volatilize in the immediate breathing area of the person near the parts." *Id.* at ¶ 42. "As a direct result of their frequent exposure to TCE, benzene, and/or other hazardous chemicals, Plaintiffs developed non-Hodgkin's lymphoma, kidney cancer, and other life-threatening ailments." *Id.* at ¶ 36. Of the twenty Plaintiffs, six were diagnosed with lymphoma, four with renal cell carcinoma, four with multiple myeloma, three with non-Hodgkin's lymphoma, one with kidney cancer, one with acute lymphoblastic leukemia, and one with sarcoma. Doc. 45, App. Def.'s Mot. Exs. A–T.

---

[1] In their Amended Objections and Responses to Safety-Kleen's First Set of Interrogatories, each Plaintiff stated "upon information and belief" that they were
> exposed to Safety-Kleen 105 Solvent Recycled; Safety-Kleen Premium Solvent; Safety-Kleen Premium Gold Solvent (Virgin and Recycled); Lectra Clean (Bulk) (02020); Lectro Solve; Lectrosol II/Quickleen II; Lectrosol Safety Solvent Degreaser (U22935); Slide Resin Remover Aerosol (41916T); Tap Magic Original Cutting Fluid; NSS Bee & Wasp; NSS Dielectric Bee/Wasp; Methyl Chloride; Spotcheck Developer SKD-NF; Mobiltac E while employed at Carrier.

Doc. 45, App. Def.'s Mot. Exs. A–T.

Plaintiffs allege that Safety-Kleen knew of the carcinogenic effects of its products but chose to produce them anyway. Plaintiffs assert that Safety-Kleen's "then-Product and Process Development Manager Paul Dittmar" revealed that Safety-Kleen previously knew about the "hazardous, carcinogenic effects of its products." Doc. 41, Am. Pet. ¶ 38. "Ditmar . . . implored [Safety-Kleen] to utilize different technology . . . in order to eliminate benzene;" however, Safety-Kleen declined to use a safer alternative. *Id.* at ¶¶ 38–39. Plaintiffs claim that Safety-Kleen "concealed from consumers . . . that its product was contaminated with highly toxic carcinogens." *Id.* at ¶ 40.

B.   *Procedural Background*

Plaintiffs filed a products liability and negligence suit against Safety-Kleen in the County Court at Law No. 4 of Dallas County, Texas, on July 9, 2021. Doc. 1-1, Pet. Safety-Kleen removed the case to this Court on September 13, 2021. Doc. 1, Notice of Removal. On February 16, 2022, Safety-Kleen filed a Motion asking the Court to dismiss the action, sever Plaintiffs' claims, or extend the case deadlines. Doc. 27, Mot. Safety-Kleen cited Plaintiffs' deficient discovery as grounds for dismissal. *See* Doc. 28, Br. 10–15. On March 4, 2022, the parties entered an Agreed Order (Doc. 34), which extended the case deadlines 120 days, ordered Plaintiffs to provide discovery, and withdrew without prejudice Safety-Kleen's requests to dismiss or sever the case. Doc. 34, Agreed Order.

On June 14, 2021, Safety-Kleen filed the instant Motion to Sever the Plaintiffs' claims. Doc. 43, Mot. Sever 2. In its Motion, Safety-Kleen argues that Plaintiffs' claims are misjoined, and the Court should exercise its discretion to sever the claims. Doc. 44, Def.'s Br. at 5. Safety-Kleen notes that "Plaintiffs each allege 'various' exposures in different locations, at different timeframes,

while performing different jobs with numerous combinations of different products [and] have unique medical histories, risk factors, diagnoses, and prognoses." *Id.* at 8. For these reasons, Safety-Kleen argues Plaintiffs' claims arise from separate transactions and occurrences and lack a common question of law or fact. *Id.* at 6, 8–9. Alternatively, if the Court finds Plaintiffs are properly joined, Safety-Kleen urges the Court to sever Plaintiffs' claims to prevent extreme prejudice, promote efficiency, and avoid juror confusion. *Id.* at 11.

Plaintiffs maintain that their claims are properly joined and oppose severance. Doc. 46, Pls.' Resp. 2. They argue that the claims arise out of one series of transactions or occurrences and "share common issues of fact and law" because "they all allege that the products manufactured by . . . Safety-Kleen had a 'common defect' . . . that caused Plaintiffs['] cancerous ailments." *Id.* at 5–8. Plaintiffs contend that maintaining a single action will promote judicial efficiency and avoid inconsistent verdicts without causing unfair prejudice. *Id.* at 8–9. Alternatively, Plaintiffs ask the Court to wait to rule on severance until the parties have conducted further discovery. *Id.* at 9.

## II.

## LEGAL STANDARD

Under Rule 21, district courts have "broad discretion" to sever misjoined parties or their claims. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994). Rule 20 permits joinder of multiple plaintiffs in a single action if "(1) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (2) any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20. If a party does not meet both prongs of Rule 20, a court may drop the misjoined party or sever the claims asserted by that party and adjudicate them separately. Fed. R. Civ. P.

21 (allowing severance of misjoined parties or claims "at any time, on just terms"); *see also Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 520 (5th Cir. 2010).

Even if the parties have been properly joined, district courts may sever parties or claims in the interest of avoiding prejudice and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness. *See Acevedo*, 600 F.3d at 521.

> In the Fifth Circuit, the accepted basis for Rule 21 severance analysis considers five factors: (1) whether claims arise out of the same transaction, occurrence, or series of transactions or occurrence[s]; (2) whether the claims present common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*Def. Distributed v. Bruck*, 30 F.4th 414, 431 (5th Cir. 2022).

## III.

## ANALYSIS

The Court considers each of these factors in turn and concludes that Plaintiffs' claims should be severed. Plaintiffs' claims are misjoined because they do not arise out of the same transaction, occurrence, or series of transactions or occurrences. They present few, if any, common questions of law or fact. Even if Plaintiffs' claims were not misjoined, judicial economy, the potential for prejudice, and different witnesses and documentary proof support severance of Plaintiffs' claims.

A.   *Plaintiffs' claims do not arise out of the same series of transactions or occurrences because they allege different products, exposure periods, and job descriptions.*

In determining whether claims arise out of the same transaction, occurrence, or series of occurrences, "[d]istrict courts in the Fifth Circuit [apply] the logical relationship test." *EMET, LLC v. Johnson Controls, Inc.*, 2021 WL 4712694, at *5 (W.D. Tex. Oct. 7, 2021) (collecting cases). The "logical relationship" inquiry asks whether claims "share an aggregate of operative facts." *See New*

*York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 882 (5th Cir. 1998) (observing in the context of Rule 13, "while using the 'logical relationship' concept, this Circuit gives weight to whether the claim and counterclaim share an 'aggregate of operative facts.'"). *See also Off. Stanford Invs. Comm. v. Am. Lebanese Syrian Associated Charities, Inc.*, 2015 WL 13739835, at *4 (N.D. Tex. July 22, 2015) ("[I]ndependent defendants satisfy the transaction-or-occurrence test of Rule 20 when there is a logical relationship between the separate causes of action. . . . In other words, the defendants' allegedly infringing acts, which give rise to the individual claims of infringement, must share an aggregate of operative facts.").

Plaintiffs' claims lack the necessary aggregate of operative facts to constitute a series of transactions or occurrences. Each Plaintiff claims to have been exposed to at least one of fifteen different Safety-Kleen solvents while employed at Carrier.[2] Based on these allegations, it is possible that no two Plaintiffs were exposed to the same combination of solvents. Each Plaintiff was exposed to a solvent or solvents to varying degrees due to the different jobs and periods of employment. Some Plaintiffs worked in close proximity to the alleged carcinogens; others were rarely exposed. Some were exposed for several decades; others for as little as two years. And Plaintiffs developed different forms of cancer.

Similarly, what Safety-Kleen knew or reasonably should have known about the safety of its products varies among the Plaintiffs. What Safety-Kleen knew or should have known about its solvents' alleged health risks in 2007 is irrelevant to Plaintiff Stephnie Gee, who was employed at Carrier from 1973 to 1975. *See* Doc. 45, App. Def.'s Mot. 103. Similarly, Rayven Richards's claims require no information about the chemical makeup of Safety-Kleen solvents in 1971 because he did

---

[2] As noted above, none of the Plaintiffs have identified a specific solvent or solvents to which they were exposed.

not begin working at Carrier until 2005. *See* Doc. 45, App. Def.'s Mot. 153. While some operative facts overlap between Plaintiffs' claims, the differences predominate.

Other courts have severed claims when location and duration of exposure to toxic substances vary across plaintiffs. In *Aregood v. International Flavors & Fragrances, Inc.*, the court severed the claims of twenty-seven plaintiffs who alleged that exposure to workplace chemicals caused them to develop pulmonary illnesses. 2015 WL 13631742 (S.D. Ind. Jan. 13, 2015). Although the plaintiffs worked at the same ConAgra facility, "[they] differ[ed] in time employed at ConAgra, location at the plant, work performed, and duration and magnitude of exposure." *Id.* at *1. The plaintiffs also received different diagnoses and prognoses. *Id.* The court concluded, "Each Plaintiff's claim turns on its own unique set of facts, which triggers a unique set of defenses. With such varying circumstances, Plaintiffs' claims do not logically arise out of the same series of transactions." *Id.* at *2.

Similarly, in *Cambre v. Union Carbide Corporation*, the court severed the claims of seven plaintiffs who were exposed to ethylene oxide at different locations and had "significant differences in the timing and length" of exposure, even though the plaintiffs all developed the same disease. 2022 WL 898748, at *2–3 (E.D. La. Mar. 28, 2022). The court noted that although the plaintiffs all were diagnosed with breast cancer, medical evidence was certain to vary across plaintiffs due to their unique risk factors for the development of breast cancer and unique degree of exposure to ethylene oxide. *Id.* at *3; *see also Ellis v. Evonik Corp.*, 2022 WL 1719196 (E.D. La. May 27, 2022) (severing claims where plaintiffs had different timing, length, and proximity of exposure to ethylene oxide, each claim presented distinct legal issues, and each claim involved varied medical evidence).

Plaintiffs argue that the facts of *Dayton Independent School District v. U.S. Mineral Products. Company*, 1989 WL 237732 (E.D. Tex. Feb. 14, 1989) should inform the Court's severance decision,

but *Dayton* is inapposite. In *Dayton*, the plaintiffs were building owners who sued the manufacturer of asbestos-containing building materials to recover the cost of removal of the materials. *Id.* at *1. Importantly, the plaintiffs sought damages for asbestos removal, not for diseases allegedly caused by exposure. *Id.* In *Dayton*, the plaintiffs had to prove that the asbestos-containing ceiling tiles were hazardous and unreasonably dangerous to the occupants. *Id.* at *2. In contrast, here, Plaintiffs must each prove that a Safety-Kleen product or products caused them to develop their particular form of cancer. Unlike in *Dayton*, the evidence regarding length of exposure and medical causation will vary widely among Plaintiffs. The *Dayton* court also noted that special considerations weighed against severance in asbestos cases. *See id.* at *1 ("Once again, the Court is faced with a situation which has become all too familiar—the dilemma of managing a large number of asbestos-related cases. . . . [A] case-by-case approach to the management of these cases is totally unacceptable."). Such considerations are not present here. Plaintiffs' other authorities address factually dissimilar situations that are not persuasive in this case. *See MyMail, Ltd. v. Am. Online, Inc.*, 223 F.R.D. 455 (E.D. Tex. 2004) (patent infringement); *Hanley v. First Invs. Corp.*, 151 F.R.D. 76 (E.D. Tex. 1993) (securities fraud). Because Plaintiffs allege different products, exposure periods, and job descriptions, their claims do not arise out of the same series of transactions or occurrences.

B.      *Plaintiffs' claims share few common questions of fact or law because Plaintiffs worked at Carrier for different lengths of time and had different levels of exposure to Safety-Kleen products.*

Because Plaintiffs' claims do not arise out of the same series of transactions or occurrences, they are misjoined. However, the Court briefly analyzes the second prong of the test: whether the claims share common questions of fact or law. At least one question is common to all Plaintiffs: the mechanism of exposure. Plaintiffs allege that Carrier's degreasing process involved solvents flowing "in a stream through the air in an open system, causing the carcinogens in the solvent to volatilize

in the immediate breathing area of the persons near the parts washer and/or degreaser units." Doc. 41, Am. Compl. ¶ 42. Safety-Kleen denies this allegation. Doc. 42, Answer ¶ 42. Because Plaintiffs allege they were each exposed to carcinogens through this process, and no evidence has been presented that this process changed over time, Plaintiffs share at least one common issue of law or fact.

Plaintiffs argue that their claims "share a lot of common issues of law and fact: same product defect, product safety, inadequate warning, same facility, overlapping exposure period, and same defendant conduct, et al." Doc. 46, Pls.' Resp. 6. But Plaintiffs' pleadings and interrogatory responses belie this claim. Each Plaintiff's claim relies on what chemicals were in Safety-Kleen solvents, what warnings Safety-Kleen gave, and what Safety-Kleen knew about the safety of its products. But relevant to each Plaintiff is only Safety-Kleen's solvent composition, warnings, and level of knowledge *at the time that Plaintiff was employed*. And while each Plaintiff's exposure overlaps with at least one other plaintiff, no exposure period was common to all Plaintiffs. While Plaintiffs share at least one common question of fact or law, the differences in factual and legal questions predominate and support severance.

C.  *Severance will not materially affect the prospect of settlement of the claims or judicial economy.*

The parties disagree about whether severance will facilitate judicial economy and settlement of claims. Safety-Kleen contends that severance would facilitate "focused, claim-specific negotiations and mediations" and allow a trial of one Platintiff's claims to "inform potential resolution of others." Doc. 44, Def.'s Br. 19. Plaintiffs do not dispute this claim in their brief. As the Agreed Order demonstrates, some Plaintiffs have been more proactive than others in seeking resolution of their claims. *See* Doc. 34, Agreed Order (ordering various Plaintiffs to complete or amend their responses

to Safety-Kleen's First Sets of Interrogatories). But courts have also recognized that denying severance may increase the efficiency of settlement negotiations. *See Paragon Off. Servs., LLC v. UnitedHealthcare Ins. Co.*, 2012 WL 4442368, at *2–3 (N.D. Tex. Sept. 26, 2012) (rejecting the argument that "severance will promote settlement by allowing an easier assessment of the separate claims" and explaining it is more efficient for "settlement discussions [to] be conducted within the structure of one lawsuit rather than two, and under the directives of one court rather than two"). Because this case has twenty Plaintiffs, severance may hinder efficient administration of settlement negotiations.

Plaintiffs argue that "joinder . . . will aid efficient resolution of the case" by avoiding "twenty separate discoveries" on overlapping issues of fact. Doc. 46, Pls.' Resp. 8–9. This claim is not persuasive for two reasons. First, as the Court observed above, much of the discovery regarding causation, damages, and even negligence will be irrelevant to some or most Plaintiffs. And while one trial is generally more efficient than 20 trials, "these cases are clearly destined for separate trials." *See Cambre*, 2022 WL 898748, at *3. The relevant facts among Plaintiffs' claims vary widely. Second, Plaintiffs could have mitigated some of the inefficiency of separate discovery by promptly providing discovery. Magistrate Judge Ramirez had to order Plaintiffs to respond to Safety-Kleen's interrogatories. Plaintiffs' assertion that severance avoids inefficiency rings hollow where their delay furthered this inefficiency. In light of these considerations, the Court finds that judicial efficiency concerns neither favor nor disfavor severance.

*(4)    Severance would avoid prejudice to Safety-Kleen.*

Allowing Plaintiffs' claims to proceed together would be unduly prejudicial to Safety-Kleen. Where multiple plaintiffs must prove a single defendant's actions caused them to develop a disease,

allowing the claims to proceed together risks unfairly prejudicing the defendant. *See Ellis*, 2022 WL 1719196, at *16 (trying fourteen plaintiffs' claims that ethylene oxide exposure caused their breast cancer together would be unduly prejudicial); *Cambre*, 2022 WL 898748, at *3 (trying seven plaintiffs' claims of exposure to ethylene oxide together would be unduly prejudicial). Trying all 20 Plaintiffs' claims together risks undue prejudice and jury confusion. *See Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 758–59 (C.D. Cal. 2016) (severing two claims because the two plaintiffs used Roundup "under vastly different circumstances, including frequency and duration of exposure," during periods twenty years apart and "[c]onsolidating the two claims may give rise to the easy, potentially prejudicial inference that if Roundup caused [one plaintiff's] cancer it caused [the other's cancer] as well, or vice versa"). Given the number of Plaintiffs and the factual differences among their cases, the risk of jury confusion would be high if the claims were tried together, even if the Court gave a limiting instruction. The potential for prejudice weighs in favor of severance.

*(5) Plaintiffs' claims will require different witnesses and documentary proof.*

As discussed above, Plaintiffs' claims will require different witnesses and documentary proof. Plaintiffs will need different medical experts to prove causation of their different types of cancer. They will need different proof about their personal and environmental risk factors for developing their form of cancer. They will need different documentation of the types of solvents used during their period of employment at Carrier. They will need different proof about how often their were exposed to Safety-Kleen solvents in their roles at Carrier. They will need different proof about what Safety-Kleen knew about the risks of their products during their time of employment at Carrier. These differences are not trivial. *See Ellis*, 2022 WL 1719196, at *14 ("The distinct periods of exposure will [] bear on each plaintiff's showing of fault and causation, thereby affecting the legal

viability of each plaintiff's case. . . . [D]ifferences [in proximity to airborne toxins also] bear heavily on the causation element of each plaintiff's claim."). The differences in evidentiary proof support severance.

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Safety-Kleen's Motion to Sever (Doc. 43) and **SEVERS** the case into twenty distinct civil actions to be assigned to this Court.

**SO ORDERED**.

**SIGNED: October 6, 2022.**

*[signature]*
**JANE J. BOYLE
UNITED STATES DISTRICT JUDGE**